OPINION OF THE COURT
AMBRO, Circuit Judge
In 1991 George Holliday recorded video of the Los Angeles Police Department officers beating Rodney King and submitted it to the local news. Filming police on the job was rare then but common now. With advances in technology and the widespread ownership of smartphones, “civilian recording of police officers is ubiquitous.” Jocelyn Simonson, Copwatching, 104 Cal. L. Rev. 391, 408 (2016); see Seth F. Kreimer, Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record, 159 U. Pa. L. Rev. 335, 337 (2011). These recordings have both exposed police misconduct and exonerated officers from errant charges. However, despite the growing frequency of private citizens recording police activity and its importance to all involved, some jurisdictions have attempted to regulate the extent of this practice. Individuals making recordings have also faced retaliation by officers, such as arrests on false criminal charges and even violence.
This case involves retaliation. Richard Fields and Amanda Geraci attempted to record Philadelphia police officers carrying out official duties in public and were retaliated against even though the Philadelphia Police Department’s official policies recognized that “[p]rivate individuals have a First Amendment right to observe and record police officers engaged in the public discharge of their duties.” J.A. 1187. No party contested the existence of the First Amendment right. Yet the District Court concluded that neither Plaintiff had engaged in First Amendment activity because the conduct — the act of recording— was not sufficiently expressive. However, this case is not about whether Plaintiffs expressed themselves through conduct. It is whether they have a First Amendment right of access to information about how our public servants operate in public.
Every Circuit Court of Appeals to address this issue (First, Fifth, Seventh, Ninth, and Eleventh) has held that there is a First Amendment right to record police activity in public. See Turner v. Lieutenant Driver, 848 F.3d 678 (5th Cir. 2017); Gericke v. Begin, 753 F.3d 1 (1st Cir. *356 2014); Am. Civil Liberties Union of III. v. Alvarez, 679 F.3d 583 (7th Cir. 2012); Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011); Smith v. City of Cumming, 212 F.3d 1332 (11th Cir. 2000); Fordyce v. City of Seattle, 55 F.3d 436 (9th Cir. 1995). Today we join this growing consensus. Simply put, the First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public.
I. BACKGROUND
In September 2012, Amanda Geraci, a member of the police watchdog group “Up Against the Law,” attended an anti-frack-ing protest at the Philadelphia Convention Center. She carried her camera and wore a pink bandana that identified her as a legal observer. About a half hour into the protest, the police acted to arrest a protestor. Geraci moved to a better vantage point to record the arrest and did so without interfering with the police. An officer abruptly pushed Geraci and pinned her against a pillar for one to three minutes, which prevented her from observing or recording the arrest. Geraci was not arrested or cited.
One evening in September 2013, Richard Fields, a sophomore at Temple University, was on a public sidewalk where he observed a number of police officers breaking up a house party across the street. The nearest officer was 15 feet away from him. Using his iPhone, he took a photograph of the scene. An officer noticed Fields taking the photo and asked him whether he “like[d] taking pictures of grown men” and ordered him to leave. J.A. 8. Fields refused, so the officer arrested him, confiscated his phone, and detained him. The officer searched Fields’ phone and opened several videos and other photos. The officer then released Fields and issued him a citation for “Obstructing Highway and Other Public Passages.” These charges were withdrawn when the officer did not appear at the court hearing.
Fields and Geraci brought 42 U.S.C. § 1983 claims against the City of Philadelphia and certain police officers. They alleged that the officers illegally retaliated against them for exercising their First Amendment right to record public police activity and violated their Fourth Amendment right to be free from an unreasonable search or seizure.
They also pointed out that the City’s Police Department’s official policies recognized their First Amendment right. In 2011 the Department published a memorandum advising officers not to interfere with a private citizen’s recording of police activity because it was protected by the First Amendment. In 2012 it published an official directive reiterating that this right existed. Both the memorandum and directive were read to police officers during roll call for three straight days. And in 2014, after the events in our case and the occurrence of other similar incidents, the Department instituted a formal training program to ensure that officers ceased retaliating against bystanders who recorded their activities.
The District Court nonetheless granted summary judgment in favor of Defendants on the First Amendment claims. They did not argue against the existence of a First Amendment right, but rather contended that the individual officers were entitled to qualified immunity and that the City could not be vicariously liable for the officers’ acts. Yet the District Court on its own decided that Plaintiffs’ activities were not protected by the First Amendment because they presented no evidence that their “conduct may be construed as expression of a belief or criticism of police activity.” Fields v. City of Philadelphia, 166 F.Supp.3d 528, 537 (E.D. Pa. 2016). *357 When confronted by the police, Plaintiffs did not express their reasons for recording. Their later deposition testimony showed that Geraci simply wanted to observe and Fields wanted to take a picture of an “interesting” and “cool” scene. Id. at 539. In addition, neither testified of having an intent to share his or her photos or videos. Id. The District Court thus concluded that, “[a]bsent any authority from the Supreme Court or our Court of Appeals, we decline to create a new First Amendment right for citizens to photograph officers when they have no expressive purpose such as challenging police actions.” Id. at 542.
Because of this ruling, the District Court did not reach the issues of qualified immunity or municipal liability. However, it allowed the Fourth Amendment claims to go to trial. Id. (“The citizens are not without remedy because once the police officer takes your phone, alters your technology, arrests you or applies excessive force, we proceed to trial on the Fourth Amendment claims.”). By stipulation, Plaintiffs dismissed their Fourth Amendment claims so that they could immediately appeal the First Amendment ruling.
II. JURISDICTION AND STANDARDS
The District Court had subject matter jurisdiction over these federal civil rights claims under 28 U.S.C. §§ 1331 & 1343, and we have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over the District Court’s grant of summary judgment. Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 387 (3d Cir. 2010). It “is appropriate only where, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.” Id. (alteration in original and citation omitted). Because this is a First Amendment case, we must also “engage in a searching, independent factual review of the full record.” Am. Civil Liberties Union v. Mukasey, 534 F.3d 181, 186 (3d Cir. 2008) (citations omitted).
III. ORDER OF ANALYSIS
Defendants ask us to avoid ruling on the First Amendment issue. Instead, they want us to hold that, regardless of the right’s existence, the officers are entitled to qualified immunity and the City cannot be vicariously liable for the officers’ acts. We reject this invitation to take the easy way out. Because this First Amendment issue is of great importance and the recording of police activity is a widespread, common practice, we deal with it before addressing, if needed, defenses to liability.
In Saucier v. Katz, the Supreme Court held that courts must determine whether a constitutional right existed before deciding if it had been “clearly established” such that defendants would not be entitled to qualified immunity. 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Less than a decade later, however, the Court reversed course in Pearson v. Callahan, holding that courts instead have the discretion to choose to address immunity first and bypass the substantive constitutional issue. 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). We have not ruled on the First Amendment right, instead merely holding that at the time of our rulings the claimed right was not clearly established. Kelly v. Borough of Carlisle, 622 F.3d 248 (3d Cir. 2010); True Blue Auctions v. Foster, 528 Fed.Appx. 190 (3d Cir. 2013).
In the years since, First Amendment issues from the recording of police activity recur, and they deal directly with constitutional doctrine. With technological progress and the ubiquity of smartphone own *358 ership — especially in the years since our Kelly decision — we are now in an age where the public can record our public officials’ conduct and easily distribute that recording widely. This increase in the observation, recording, and sharing of police activity has contributed greatly to our national discussion of proper policing. Consequently, police departments nationwide, often with input from the U.S. Department of Justice, are developing polices addressing precisely these issues, and our opinion can assist in their efforts to comply with the Constitution. Moreover, in the case before us the constitutional question is not “so factbound that [our] decision [will] provide[] little guidance for future cases.” Pearson, 555 U.S. at 237, 129 S.Ct. 808. All we need to decide is whether the First Amendment protects the act of recording police officers carrying out official duties in public places. We also have excellent briefing on appeal, including counsel for the parties and eight amici, including the U.S. Department of Justice, the Cato Institute, well-known First Amendment law professors, and some of the largest news organizations in the country. We therefore address the First Amendment question before moving to the defenses.
IY. THE FIRST AMENDMENT RIGHT TO RECORD
The District Court concluded that Plaintiffs engaged in conduct only (the act of making a recording) as opposed to expressive conduct (using the recording to criticize the police or otherwise comment on officers’ actions). It did so by analogy, applying the “expressive conduct” test used to address symbolic speech: “Conduct is protected by the First Amendment when the nature of the activity, combined with the factual context and environment in which it was undertaken, shows that the activity was sufficiently imbued with elements of communication to fall within the First Amendment’s scope.” Fields, 166 F.Supp.3d at 534 & n.34 (quoting Tenafly Eruv Ass’n, Inc. v. Borough of Tenafly, 309 F.3d 144, 158 (3d Cir. 2002)).
We disagree on various fronts. Foremost is that the District Court focused on whether Plaintiffs had an expressive intent, such as a desire to disseminate the recordings, or to use them to criticize the police, at the moment when they recorded or attempted to record police activity. See id. at 534-35. This reasoning ignores that the value of the recordings may not be immediately obvious, and only after review of them does their worth become apparent. The First Amendment protects actual photos, videos, and recordings, see Brown v. Entm’t Merchants Ass’n, 564 U.S. 786, 790, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011), and for this protection to have meaning the Amendment must also protect the act of creating that material. There is no practical difference between allowing police to prevent people from taking recordings and actually banning the possession or distribution of them. See Alvarez, 679 F.3d at 596 (“Restricting the use of an audio or audiovisual recording device suppresses speech just as effectively as restricting the dissemination of the resulting recording.”); see also Cato Institute Ami-cus Br. 7 (“[B]oth precedent and first principles demonstrate that the First Amendment protects the process of capturing inputs that may yield expression, not just the final act of expression itself’); Kreimer, 159 U. Pa. L. Rev. at 366 (“[T]he threat of arrest remains a potent deterrent to spontaneous photographers who have no deep commitment to capturing any particular image.”). As illustrated here, because the officers stopped Ms. Geraci from recording the arrest of the protestor, she never had the opportunity to decide to put any recording to expressive use.
*359 Plaintiffs and some amici argue that the act of recording is “inherently expressive conduct,” like painting, writing a diary, dancing, or marching in a parade. See, e.g., First Amendment Law Professors Amicus Br. 8 (“If writing in an undistributed diary is speech, making an undistributed recording can be characterized, as speech as well.”); Society for Photographic Education Amicus Br. 2 (“Making a photograph merits First Amendment protection because it is artistic expression just the same as painting a landscape, sketching a street scene, or sculpting a statue.”); Tenafly Eruv Ass’n, 309 F.3d at 160 (“‘Parades are thus a form of expression, not just motion ....’”) (quoting Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Bos., 515 U.S. 557, 568, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995)). Regardless of the merits of these arguments, our case is not about people attempting to create art with police as their subjects. It is about recording police officers performing their official duties.
The First Amendment protects the public’s right of access to information about their officials’ public activities. It “goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.” First Nat’l. Bank of Bos. v. Bellotti, 435 U.S. 765, 783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Access to information regarding public police activity is particularly important because it leads to citizen discourse on public issues, “the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.” Snyder v. Phelps, 562 U.S. 443, 452, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (quoting Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)); Garrison v. Louisiana, 379 U.S. 64, 77, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (recognizing the “paramount public interest in a free flow of information to the people concerning public officials, their servants”). That information is the wellspring of our debates; if the latter are to be “ ‘uninhibited, robust, and wide-open,’ ” Snyder, 562 U.S. at 452, 131 S.Ct. 1207 (quoting N. Y. Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)), the more credible the information the more credible are the debates.
To record what there is the right for the eye to see or the ear to hear corroborates or lays aside subjective impressions for objective facts. Hence to record is to see and hear more accurately. Recordings also facilitate discussion because of the ease in which they can be widely distributed via different forms of media. Accordingly, recording police activity in public falls squarely within the First Amendment right of access to information. As no doubt the press has this right, so does the public. See PG Publ’g. Co. v. Aichele, 705 F.3d 91, 99 (3d Cir. 2013); Branzburg v. Hayes, 408 U.S. 665, 684, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).
Bystander videos provide different perspectives than police and dashboard cameras, portraying circumstances and surroundings that police videos often do not capture. Civilian video also fills the gaps created when police choose not to record video or withhold their footage from the public. See Nat’l Police Accountability Project Amicus Br. 7 (noting that “[a] recent survey of 50 major police departments’ policies on body cameras revealed that many policies either failed to make clear when officers must turn on their body cameras, gave officers too much discretion when to record, or failed to require explanations when officers did not record”) (citation omitted).
The public’s creation of this content also complements the role of the news media. *360 Indeed, citizens’ gathering and disseminating “newsworthy information [occur] with an ease that rivals that of the traditional news media.” 2012 U.S. D.O.J. Letter to Baltimore Police Department; J.A. 1684. See also Glik, 655 F.3d at 78 (“The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper.”). In addition to complementing the role of the traditional press, private recordings have improved professional reporting, as “video content generated by witnesses and bystanders has become a common component of news programming.” The Reporters Committee for Freedom of the Press and 31 Media Organizations Amicus Br. 11; see also id. at 2 (“Today, the first source of information from the scene of a newsworthy event is frequently an ordinary citizen with a smart phone.”). And the inclusion of “bystander video enriches the stories journalists tell, routinely adding a distinct, first-person perspective to news coverage.” Id. at 12.
Moreover, the proliferation of bystander videos has “spurred action at all levels of government to address police misconduct and to protect civil rights.” See Nat’l Police Accountability Proj. Amicus Br. 1. These videos have helped police departments identify and discipline problem officers. They have also assisted civil rights investigations and aided in the Department of Justice’s work with local police departments. And just the act of recording, regardless what is recorded, may improve policing. See Glik, 655 F.3d at 82-83. Important to police is that these recordings help them carry out their work. They, every bit as much as we, are concerned with gathering facts that support further investigation or confirm a dead-end. And of particular personal concern to police is that bystander recordings can “exonerate an officer charged with wrongdoing.” Turner, 848 F.3d at 689.
We do not say that all recording is protected or desirable. The right to record police is not absolute. “[I]t is subject to reasonable time, place, and manner restrictions.” Kelly, 622 F.3d at 262; see Whiteland Woods, L.P. v. Twp. of W. Whiteland, 193 F.3d 177, 183 (3d Cir. 1999). But in public places these restrictions are restrained.
We need not, however, address at length the limits of this constitutional right. Defendants offer nothing to justify their actions. Fields took a photograph across the street from where the police were breaking up a party. Geraci moved to a vantage point where she could record a protestor’s arrest, but did so without getting in the officers’ way. If a person’s recording interferes with police activity, that activity might not be protected. For instance, recording a police conversation with a confidential informant may interfere with an investigation and put a life at stake. But here there are no countervailing concerns.
In sum, under the First Amendment’s right of access to information the public has the commensurate right to record— photograph, film, or audio record — police officers conducting official police activity in public areas.
V. QUALIFIED IMMUNITY
Having decided the existence of this First Amendment right, we now turn to whether the officers are entitled to qualified immunity. We conclude they are.
Government actors are entitled to qualified immunity unless they violated a constitutional right “so clearly established *361 that ‘every reasonable official would have understood that what he is doing violates that right.’ ” Zaloga v. Borough of Moosic, 841 F.3d 170, 175 (3d Cir. 2016) (quoting Reichle v. Howards, 566 U.S. 658, 659, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012)) (emphasis in original). “In other words, existing precedent must have placed the statutory or constitutional question beyond debate.” Id. (quoting Reichle, 566 U.S. at 664, 132 S.Ct. 2088) (emphasis in original). We do not need Supreme Court precedent or binding Third Circuit precedent to guide us if there is a “robust consensus of cases of persuasive authority in the Courts of Appeals.” L.R. v. Sch. Dist. of Phila., 836 F.3d 235, 247-48 (3d Cir. 2016) (alteration and citations omitted). District court decisions, though not binding, also “play a role in the qualified immunity analysis.” Doe v. Delie, 257 F.3d 309, 321 n.10 (3d Cir. 2001). To determine whether the right is clearly established, we look at the state of the law when the retaliation occurred, here in 2012 (Geraci) and 2013 (Fields). See id.
To conduct the clearly established inquiry, we “frame the right ‘in light of the specific context of the case, not as a broad general proposition,”’ L.R., 836 F.3d at 247-48 (citation omitted), as it needs to be “specific enough to put ‘every reasonable official’ on notice of it.” Zaloga, 841 F.3d at 175 (citation omitted). At issue here is Plaintiffs’ ability to record the police carrying out official duties in public. We have never held that such a right exists, only that it might. See Gilles v. Davis, 427 F.3d 197, 212 n.14 (3d Cir. 2005) (“[V]ideotaping or photographing the police in the performance of their duties on public property may be a protected activity.”). In 2010 we held that there was no clearly established right for the public to do so, at least in the context of a police traffic stop. Kelly, 622 F.3d at 262 (‘We find these cases insufficiently analogous to the facts of this case to have put Officer Rogers on notice of a clearly established right to videotape police officers during a traffic stop [in 2007].”). Only a few years later in 2013, in a non-precedential opinion, we held that “[e]ven if the distinction between traffic stops and public sidewalk confrontations is [ ] meaningful ... [,] our case law does not clearly establish a right to videotape police officers performing their duties [in 2009].” True Blue Auctions, 528 Fed.Appx. at 192-93. So to resolve whether the right has become clearly established after these decisions, we must decide whether a “robust consensus” has emerged that puts the existence of this First Amendment right “beyond debate.” Zaloga, 841 F.3d at 175.
Plaintiffs contend the absence of Circuit precedent does not end the inquiry, as after the events in Kelly and True Blue the Philadelphia Police Department adopted official policies recognizing the First Amendment right of citizens to record police in public. As plausible as that may be on the surface, it does not win the argument. With one breath Plaintiffs assert that these policies clearly established their legal right, but for purposes of municipal liability (an issue we remand) they vigorously argue that the policies were utterly ineffective in conveying to the officers that this right clearly existed. And Plaintiffs have compiled evidence indicating this was so. For example, they point out that Captain Francis Healy, the policy advisor to the Police Commissioner, testified that, notwithstanding the adoption of the Department’s policies, the “officers didn’t understand that there was a constitutional right [to record].” Reply Br. 11 (quoting J.A. 282-83).
As to decisions of other appellate courts relevant to the qualified immunity analysis, Defendants and the District Court argue that those decisions are distinguishable be *362 cause they involved expressive intent or an intent to distribute. See, e.g., Alvarez, 679 F.3d at 588 (“The ACLU intends to publish these recordings online and through other forms of electronic media.”); Fields, 166 F.Supp.3d at 538 n.56 (“In Glik, the plaintiff expressed concern police were using excessive force arresting a young man in a public park and began recording the arrest on his cell phone[,] and the police then arrested plaintiff. ... Notably, the plaintiff in Fordyce [v. City of Seattle, 55 F.3d 436 (9th Cir. 1995)] claimed he was recording a public protest for a local news station.”); see also D.O.J. Amicus Br. 22 n. 14 (“[I]n those cases, the plaintiffs’ objectives or opinions ... [to disseminate] were apparent from context. In this respect, Fields’s case in particular is one of first impression.”). Indeed, the Fifth Circuit just this year recognized that these other appellate decisions did not clearly establish the constitutional right to record. See Turner, 848 F.3d at 687.
Where District Courts in our Circuit have held in favor of the First Amendment right, Defendants also distinguish those cases for requiring expressive act or intent, not just recording alone, once again echoing the reasoning of the District Court here. See Fields, 166 F.Supp.3d at 537 (“We find the citizens videotaping and picture-taking in [those district court cases] all contained some element of expressive conduct or criticism of police officers and are patently distinguishable from Fields’ and Geraci’s activities.”). Whether Defendants and the District Court correctly distinguished these cases, we cannot say that the state of the law at the time of our cases (2012 and 2013) gave fair warning so that every reasonable officer knew that, absent some sort of expressive intent, recording public police activity was constitutionally protected. Accordingly, the officers are entitled to qualified immunity.
VI. MUNICIPAL LIABILITY
Because of its First Amendment ruling, the District Court did not reach’ whether the City could be held liable for its officers’ conduct..See generally Monell v. Dep’t of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). While the City contends that there is no genuine issue of material fact and it cannot be held hable as a matter of law, we follow our usual practice of according our District Court colleague the initial opportunity to resolve these contentions.
⅜ * ⅜ ⅝ ⅜
We ask much of our police. They can be our shelter from the storm. Yet officers are public officials carrying out public functions, and the First Amendment requires them to bear bystanders recording their actions. This is vital to promote the access that fosters free discussion of governmental actions, especially when that discussion benefits not only citizens but the officers themselves. We thus reverse and remand for further proceedings.