**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1390
_____

JOSE ANTONIO PEROZA-BENITEZ,
                                        Appellant
v.

C.I. DARREN C. SMITH; C.I. KEVIN HASER;
C.I. MICHAEL PERKINS; OFFICER DANIEL WHITE;
OFFICER NICHOLAS EPOLITO
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5-17-cv-03980)
District Judge: Honorable Nitza I. Quiñones Alejandro
_____

Argued November 18, 2020

Before:  JORDAN, KRAUSE, and RESTREPO,
*Circuit Judges*

(Opinion Filed: April 8, 2021)

Tyson Y. Herrold [ARGUED]
Kevin M. Bovard
Baker & Hostetler LLP
2929 Arch Street
Cira Centre, 12th Floor
Philadelphia, PA 19104
      *Counsel for Appellant*

David J. MacMain
Tricia M. Ambrose [ARGUED]
MacMain Connell & Leinhauser
433 West Market Street, Suite 200
West Chester, PA 19382
      *Counsel for Appellees*

———————

OPINION OF THE COURT

———————

RESTREPO, *Circuit Judge.*

This civil rights action arises from events that took place during the execution of a search warrant at the home of Plaintiff-Appellant Jose Antonio Peroza-Benitez. Peroza-Benitez brought suit against members of the City of Reading Police Department pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the Fourth and Fourteenth Amendments of the United States Constitution. Peroza-Benitez also asserted battery claims under Pennsylvania common law. Defendants moved for summary judgment on the grounds of qualified immunity, which Peroza-Benitez opposed only as to two Defendants, Criminal Investigator (C.I.) Kevin Haser and Officer Daniel White. The District Court granted summary judgment in favor of C.I. Haser and Officer White and declined to exercise supplemental jurisdiction over Peroza-Benitez's state law claims. Peroza-Benitez appeals. For the reasons set forth in this opinion, we will vacate the District Court's order and remand for further proceedings.

2

## I.

## A.

In the predawn hours of October 8, 2015, Peroza-Benitez awoke to the sound of members of the City of Reading Police Department breaking down the back door to his third-floor apartment, pursuant to the execution of a search warrant related to suspected controlled substances offenses. "Scared" and unaware of who was entering his apartment, Peroza-Benitez climbed out of his bedroom window onto the roof of his building wearing only an undershirt, boxer shorts, and flip flops. App. 35-36. Shortly thereafter, Peroza-Benitez realized the police were in pursuit and, rather than surrendering, led officers on a rooftop chase.

Officer Darren Smith, one of the officers pursuing Peroza-Benitez on the roof, radioed that Peroza-Benitez was in possession of a firearm. Officer Smith testified that he told Peroza-Benitez "[n]umerous times to drop the gun" and, in response, Peroza-Benitez said, "I'm not gonna shoot anybody, or something along those lines." App. 52. Audio recordings corroborate that officers were told over the radio that Peroza-Benitez had a firearm. According to Officer Smith, Peroza-Benitez dropped the firearm while on the roof, App. 52-53, and several officers testified that, after Peroza-Benitez dropped the firearm, it fell off of the roof and landed on the ground in an alley. App. 52-53, 59, 97, 254. Peroza-Benitez denies having a firearm at any time during the course of the incident.[1] App.

---

[1] The District Court reasoned that since Peroza-Benitez "pled guilty to possession of a firearm as a result of this very incident," he "certainly cannot now claim that he was unarmed for the entirety of this incident." *Peroza-Benitez v. Smith*, No. 17-3980, 2020 WL 419461, at *1, n.2 (E.D. Pa. Jan. 24, 2020). Peroza-Benitez points out that the crime of possession that he pled guilty to – 18 Pa. C.S. § 6105(a)(1) ("Persons Not to Possess, Use, Manufacture, Control, Sell, or Transfer Firearms") – covers constructive, as well as actual, possession. Appellant's Br. 35; App. 313; *see* 18 Pa. C.S. § 6105(a)(1); *Commonwealth v. McClellan*, 178 A.3d 874, 876 n.1, 878 (Pa. Super. Ct. 2018). For the purposes of this appeal, we apply the summary judg-

36. However, officers recovered a firearm at the scene. There is conflicting testimony as to where the firearm was recovered: The police report indicates that the firearm was "found on Peroza-Benitez possession [sic]," App. 309, yet Officer Nicholas Epolito testified that officers located the firearm in the alley. The Defendants did agree that no items except clothing were "found on [Peroza-Benitez's] person after his arrest." App. 299.

At the end of the block, Peroza-Benitez entered an abandoned building. Several officers, including Officer Smith and C.I. Haser (who had been trailing the chase on street level), followed Peroza-Benitez into the abandoned building and cornered him on the second floor. Peroza-Benitez proceeded to climb out of a street-facing, second-story window.

By the time that Peroza-Benitez climbed out of the window, C.I. Haser was aware that Peroza-Benitez was unarmed and shifted his attention to Peroza-Benitez's safety, recognizing that the over ten-foot fall from the window could result in injury. App. 185, 187. With their firearms holstered, Officer Smith and C.I. Haser grabbed ahold of Peroza-Benitez and attempted to hoist him back through the window. App. 56-57, 185-86. Both Officer Smith and C.I. Haser testified that Peroza-Benitez – injured and "slippery" as he was covered in his own blood – resisted their efforts. App. 56-57, 185-86.

According to Peroza-Benitez, as he was hanging from the windowsill with his hands, his feet "dangling," C.I. Haser "repeatedly" punched him in the temple region of his head with a closed fist. App. 173. C.I. Haser testified that he punched Peroza-Benitez "[o]ne or two times . . . . [p]robably two," with the purpose being to "stun" and "disorient" Peroza-Benitez into compliance "to help him out." App. 186-87. C.I. Haser testified that his punches had no effect on Peroza-Benitez, who

_____

ment standard and construe the facts surrounding Peroza-Benitez's carrying of a firearm during the relevant periods of the incident in the light most favorable to Peroza-Benitez. And we leave it to the District Court in the first instance to determine, as it deems necessary, if the record supports any theory of constructive possession and what, if any, significance that may have with regard to the guilty plea.

4

continued to resist against officers' efforts to pull him back inside, although C.I. Haser noted that Peroza-Benitez did not use any force against them. It is unclear from the record when the officers let go of Peroza-Benitez. Nevertheless, at a certain point, C.I. Haser thought "we're like, screw it, you want to fall, you're gonna fall. So we let go of him." App. 187.

And Peroza-Benitez fell. C.I. Haser described Peroza-Benitez's fall as follows:

> And he's hanging from the windowsill. Now his feet are dangling below him. And he's just hanging there and he is looking at us.
>
> We're like, do you want us to help you? And he's just looking at us and his fingers slide off and he drops straight down . . . .

App. 187. According to Peroza-Benitez, C.I. Haser's punches caused him to fall.

A number of officers, as well as a police K9, had assembled on the otherwise empty street and sidewalk in front of the building and witnessed Peroza-Benitez's fall from the window. One such officer was Officer White, who positioned himself on the sidewalk below the window where Peroza-Benitez was hanging, only "10 feet" from where Peroza-Benitez would have been had he "climbed down and stood on the sidewalk or the porch." App. 96-97. Officer White had heard the earlier radio transmission that Peroza-Benitez was armed and assumed that was still the case given that he "did not see a lack of a weapon" on Peroza-Benitez when he was hanging from the window. App. 97. Officer White testified that Peroza-Benitez was "wearing some type of T-shirt" and pants as he was hanging from the window, App. 96, however, Peroza-Benitez indicated that he "was wearing only boxer shorts" at the time, App. 173.

Once C.I. Haser and Officer Smith appeared in the window, Officer White holstered his firearm (which he had been aiming at Peroza-Benitez) and drew his taser, in part because he believed that "the situation was becoming more contained."

5

App. 97, 108. According to Officer White, Peroza-Benitez was "figuratively boxed in" at this point. App. 98-99. Officer White indicated to his fellow officers that he was ready to assist should Peroza-Benitez fall. Officer White did not observe a weapon, or "the absence of one," in Peroza-Benitez's hands as he fell from the window. App. 101.

Falling feet first, Peroza-Benitez's leg collided with the railing of an elevated porch before landing backwards with a "thud" into a below-ground, concrete stairwell. App. 101. Officers' testimony differs as to whether Peroza-Benitez voluntarily moved upon landing. For example, Officer White testified that Peroza-Benitez "started to sit forward" upon landing, App. 101, while C.I. Michael Perkins testified that "[a]s soon as [Peroza-Benitez] hit the ground, he made a [lunging] motion like he was going to start running again," App. 262. In contrast, Peroza-Benitez testified that he hit his head on the concrete steps as a result of the fall and was knocked temporarily unconscious.

Officer White tased Peroza-Benitez after he struck the concrete steps. Officer White, without providing a verbal warning, deployed his taser in dart mode for a 5-second cycle. Accounts differ as to the exact duration of time that elapsed between Peroza-Benitez landing in the stairwell and getting tased, ranging from "as soon as he hit the concrete" to "less than five seconds." App. 60, 101, 189, 222, 264. However, the parties agree that Peroza-Benitez was tased either immediately or almost immediately upon landing. Appellant's Br. 8; Appellees' Br. 6.

Soon thereafter, officers took Peroza-Benitez into custody. Peroza-Benitez was transferred from the scene to the hospital, where he received care for "trauma" and underwent surgery for arm injuries and a fractured leg. App. 325.

**B.**

On September 5, 2017, Peroza-Benitez commenced the instant action. The District Court appointed pro bono counsel[2]

---

[2] We recognize Tyson Y. Herrold, Esq. and Kevin M. Bovard, Esq. of Baker & Hostetler LLP – appointed counsel –

in December 2017, and Peroza-Benitez thereafter filed an amended complaint pursuant to 42 U.S.C. § 1983, alleging that five officers used excessive force in violation of his Fourth and Fourteenth Amendment rights during his October 2015 arrest. Peroza-Benitez also asserted battery claims under Pennsylvania common law.

Following the close of discovery, Defendants filed a motion for summary judgment on the grounds of qualified immunity. Peroza-Benitez opposed the motion only as to C.I. Haser and Officer White. On January 24, 2020, the District Court granted Defendants' motion for summary judgment, finding that both C.I. Haser and Officer White were entitled to qualified immunity because Peroza-Benitez's constitutional rights at issue were not "clearly established" at the time of the incident. The District Court declined to exercise supplemental jurisdiction over Peroza-Benitez's state law claims pursuant to 28 U.S.C. § 1367(c). Peroza-Benitez appeals.

## II.

The District Court had jurisdiction over Peroza-Benitez's Fourth Amendment and Fourteenth Amendment claims under 28 U.S.C. §§ 1331, 1343 and over Peroza-Benitez's state law claims pursuant to 28 U.S.C. § 1367. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

We review *de novo* a district court's grant of summary judgment on the grounds of qualified immunity. *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014). Applying the same standard as a district court, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020). A "material fact" is one that "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a "genuine" dispute of "material fact" when "a reasonable jury could return a verdict for the nonmoving party." *Id.*; *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) ("*Santini I*"). At summary judgment, "we *must* construe all facts and inferences

for their dedicated *pro bono* representation of Peroza-Benitez in this matter.

7

in favor of the nonmoving party." *Santini I*, 795 F.3d at 419. Our role is "to determine whether there is a genuine issue for trial," it is "not . . . to weigh the evidence and determine the truth of the matter." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (quoting *Anderson*, 477 U.S. at 249).

## III.

We must determine whether it was appropriate for the District Court to grant summary judgment on the grounds of qualified immunity in favor of C.I. Haser and Officer White as to Peroza-Benitez's Fourth Amendment claims. As detailed below, we hold that, in view of disputed issues of material fact, the District Court erred in finding that C.I. Haser and Officer White were entitled to qualified immunity for their actions on October 8, 2015. Based on the following analysis, we will vacate the District Court's ruling and remand for further proceedings.

## A.

At the outset, we reemphasize that the judicially created doctrine of qualified immunity "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). While qualified immunity allows public officials to execute their duties without the constant threat of litigation, it is "no license to lawless conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). Rather, "[w]here an official could be expected to know that certain conduct would violate statutory or constitutional rights," qualified immunity calls for the official to "hesitate" before proceeding, "and a person who suffers injury caused by such conduct may have a cause of action." *Id.*

"Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Santini I*, 795 F.3d at 416-17 (quoting *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007)). At summary judgment, the burden is on the officer to establish an entitlement to qualified immunity. *Halsey*, 750 F.3d at 288. When multiple officers seek to invoke

qualified immunity, we separately consider each officer's actions. *Grant v. City of Pittsburgh*, 98 F.3d 116, 122-23 (3d Cir. 1996).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson*, 555 U.S. at 231). To determine whether a police officer is entitled to qualified immunity, we conduct a two-prong inquiry. *Davenport v. Borough of Homestead*, 870 F.3d 273, 280 (3d Cir. 2017). The first prong – a constitutional inquiry – requires us to consider the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong requires us to consider "whether the right was clearly established, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (quoting *Saucier*, 533 U.S. at 202). An answer in the negative to either prong entitles an officer to qualified immunity. *See Reedy v. Evanson*, 615 F.3d 197, 223-24 (3d Cir. 2010). Courts may begin their inquiry with either prong. *See Santini I*, 795 F.3d at 418 (citing *Pearson*, 555 U.S. at 236).

**B.**

The District Court chose to begin with the "clearly established" prong. We will do the same.

To determine whether a right was "clearly established," we conduct a two-part inquiry. First, we must "define the right allegedly violated at the appropriate level of specificity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012). This requires use to frame the right "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201; *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Second, we must ask whether that right was "clearly established" at the time of its alleged violation, *i.e.*, whether the right was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640

9

(1987)). This is an "objective (albeit fact-specific) question," where "[an officer]'s subjective beliefs . . . are irrelevant." *Anderson*, 483 U.S. at 641; *see also Reedy*, 615 F.3d at 224.

We answer this question by first looking to factually analogous Supreme Court precedent, as well as binding opinions from our own Court. *Fields v. City of Phila.*, 862 F.3d 353, 361 (3d Cir. 2017). Next, we consider whether there is a "robust consensus of cases of persuasive authority in the Courts of Appeals." *Id.* (quoting *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 248 (3d Cir. 2016)). We may also take into account district court cases, from within the Third Circuit or elsewhere. *See id.* (citing *Doe v. Delie*, 257 F.3d 309, 321 n.10 (3d Cir. 2001)).[3]

As we examine the case law, we must keep in mind that this Court takes a "broad view of what constitutes an established right of which a reasonable person would have known." *Kopec v. Tate*, 361 F.3d 772, 778 (3d Cir. 2004) (quoting *Burns v. Cnty. of Cambria*, 971 F.2d 1015, 1024 (3d Cir. 1992)). And a right may be "clearly established" even without a "'precise factual correspondence' between the case at issue and a previous case." *Id.* (quoting *People of Three Mile Island v. Nuclear Regulatory Comm'rs*, 747 F.2d 139, 144-45 (3d Cir. 1984)); *see also Ashcroft*, 563 U.S. at 741 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.") (citation omitted). A public official does not get the benefit of "one liability-free violation" simply because the circumstance of his case is not identical to that of a prior case. *Kopec*, 361 F.3d at 778 (quoting *People of Three Mile Island*, 747 F.2d at 145).

And while "[p]recedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful," *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting

---

[3] We note that "appellate review of qualified immunity dispositions is to be conducted in light of all relevant precedents, not simply those cited to, or discovered by, the district court." *Elder v. Holloway*, 510 U.S. 510, 512 (1994).

*Mullenix*, 577 U.S. at 18), in some exceptional cases the "violation [is] obvious" such that general statements of law may suffice to show that a right is "clearly established," even in the absence of factually analogous precedent, *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (internal quotations omitted)); *Russell v. Richardson*, 905 F.3d 239, 252 (3d Cir. 2018). In the excessive force context, an "obvious" case is one where the general statements of law articulated in *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985) provide the requisite notice.[4] *Brosseau*, 543 U.S. at 198-99.

**1.**

The District Court found that C.I. Haser was entitled to qualified immunity as "[his] actions did not violate a clearly established constitutional right, because 'a reasonable officer in [his] shoes at the time in question would not have perceived federal law to preclude' his conduct." *Peroza-Benitez v. Smith*, No. 17-3980, 2020 WL 419461, at *4 (E.D. Pa. Jan. 24, 2020) (quoting *Brown v. Cwynar*, 484 F. App'x 676, 681 (3d Cir. 2012)). We disagree. Viewing the facts in the light most favorable to Peroza-Benitez as the non-moving party – as we are required to do at summary judgment – a reasonable jury could find that C.I. Haser's actions violated a "clearly established" right.

We first define the right that C.I. Haser allegedly violated. The District Court defined Peroza-Benitez's right as "the Fourth Amendment right to be free from excessive force in the form of multiple punches to the head while hanging out of a window through which he had attempted to flee and while

---

[4] *Graham* "clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Brosseau*, 543 U.S. at 198 (quoting *Saucier*, 533 U.S. at 201-02); *see Graham*, 490 U.S. at 396. And *Garner* stands for the proposition that "[deadly] force may not be used unless it is necessary to prevent . . . escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3.

known to be unarmed." *Peroza-Benitez*, 2020 WL 419461, at *4. Here, Peroza-Benitez was unarmed, injured, covered in his own blood, and hanging from a second-story window by his hands, feet dangling, when C.I. Haser – knowing Peroza-Benitez to be unarmed – punched him "repeatedly" in the head with a closed fist. App. 173. C.I. Haser's punches "stunned and disoriented" Peroza-Benitez, causing him to fall over ten feet into a below-ground concrete stairwell. App. 173. Accordingly, we rely on a modification of the District Court's definition: The Fourth Amendment right of an injured, visibly unarmed suspect to be free from temporarily paralyzing force while positioned at a height that carries with it a risk of serious injury or death.

Next, we ask whether Peroza-Benitez's defined right was "clearly established" at the time of C.I. Haser's alleged violation. We do not find any factually analogous precedent from either the Supreme Court or our own Court, thus we turn to persuasive authority in the Courts of Appeals and district courts. It is within this inquiry that we find the necessary "robust consensus of cases" supporting our holding that a reasonable jury could find that C.I. Haser, by punching Peroza-Benitez "repeatedly" in the head as he hung out of a second-story window, violated a "clearly established" right. *Fields*, 862 F.3d at 361; App. 173.

In *Martin v. City of Reading* – decided less than three months prior to the incident at question here – police pursued the plaintiff to a highway overpass, from which the plaintiff fell nearly 40 feet onto concrete after being tased by a City of Reading police officer. 118 F. Supp. 3d 751, 756-58 (E.D. Pa. 2015). The plaintiff brought a § 1983 action against the police officer for use of excessive force in violation of his Fourth Amendment rights, alleging that the police officer's deployment of the taser caused him to fall from the overpass. *Id.* At summary judgment, rather than focusing "on the qualitative characteristics of the particular type of weapon [the police officer] chose to employ," the district court instead considered "whether a reasonable officer would understand that attempting to effect Plaintiff's arrest by using force that carried with it a risk of serious injury or death violated Plaintiff's rights." *Id.* at 765-66. Answering in the affirmative, the district court – viewing the facts in the light most favorable to the plaintiff as

12

the non-moving party – denied the police officer summary judgment on the grounds of qualified immunity.

In support of its finding, the court in *Martin* cited a number of similar excessive force cases where courts have denied (or affirmed the denial of) a defendant's motion for summary judgment on the grounds of qualified immunity based on the following fact pattern:  Police tase an individual who is positioned on an elevated surface at a height that carries with it a risk of serious injury or death, causing the individual to fall. *Id.* at 766-67; *accord Baker v. Union Twp.*, 587 F. App'x 229, 234 (6th Cir. 2014) ("It is widely known among law enforcement and was even a subject of [the officer's] police training that tasers should not be employed against suspects on elevated surfaces because of the risk of serious injury from a resulting fall."); *Negron v. City of New York*, 976 F. Supp. 2d 360, 368, 371 (E.D.N.Y. 2013) (noting that "[the officers] should have known" that tasing the plaintiff – who was "standing on a small, unenclosed ledge ten feet off the ground" – "was unreasonable even despite the lack of precedent involving tasers used under similar circumstances"); *Rockwell v. Rawlins*, No. 13-cv-3049, 2014 WL 5426716, at *4 (D. Md. Oct. 23, 2014) ("While tasers may not constitute deadly force in some scenarios, deadly force was clearly used in this case.  [The plaintiff] was standing on a narrow second-story ledge/roof, and there is no evidence to suggest that a reasonable police officer would not have expected [the plaintiff] to fall if he was tased.") (footnote omitted); *Peabody v. Perry Twp.*, No. 10-cv-1078, 2013 WL 1327026, at *5-7 (S.D. Oh. Mar. 29, 2013) (noting that a reasonable jury could determine that the deployment of a taser against an individual climbing an eight-foot fence could constitute deadly or lethal force); *Snauer v. City of Springfield*, No. 09-cv-6277, 2010 WL 4875784, at *5 (D. Or. Oct. 1, 2010), *report and recommendation adopted by district judge* 2010 WL 4861135 (D. Or. Nov. 23, 2010) ("[The officer] was trained in the use of a taser and knew well that a tasered suspect becomes temporarily paralyzed. . . .  It does not take a panel of judges to alert a reasonable police officer that causing a [temporarily] paralyzed man to tumble head first onto the ground from a platform six to seven feet above the ground creates a substantial risk of causing death or serious bodily injury.") (citation and internal quotations omitted); *cf. Harper v. Perkins*, 459 F. App'x 822, 827-28 (11th Cir. 2012) (affirming district

13

court's denial of defendant's motion to dismiss on the grounds of qualified immunity because *inter alia* the defendant's force "was obviously and clearly excessive," particularly given that "a taser was used on a person standing with his hands in the air at least four feet off the ground in a tree"); *Cook v. Riley*, No. 11-cv-24, 2012 WL 2239743, at *12 (M.D.N.C. June 15, 2012) (recommending denial of summary judgment on the grounds of qualified immunity in part because "[the plaintiff] was perched on a small platform 15 feet in the air at the time of the TASER deployment [and a] factfinder could conclude that a reasonable officer would foresee that utilizing a TASER under such circumstances could cause the targeted individual to fall and thereby to suffer serious harm . . . .") (internal citations omitted).

While each of these cases, including *Martin*, concerns a police officer tasing, as opposed to punching, an individual vulnerable to falling from a precarious height, tasing is sufficiently analogous to punching in this context such that a reasonable jury could find that C.I. Haser's actions violated a "clearly established" right. The risk in using a taser on an individual positioned on an elevated surface is that the individual could fall off said surface once incapacitated by the taser and suffer serious injury or death. Officer Smith – who was with C.I. Haser at the window – testified that it is "against protocol" to "tase someone on the roof" because if "they fall off, that's not going to be good. We're not gonna tase someone that's on a roof." App. 53. The same exact logic applies to deliberately punching someone "to stun" them, App. 187, when that person is hanging out of a window. *Cf. Martin*, 118 F. Supp. 3d at 761-62 & n.8 (referring to a City of Reading Police Department policy that "forbids officers from using a Taser when the subject is in a position where a fall may cause substantial injury or death" as recognition of "[t]he fact that the use of a Taser – which is ordinarily a non-lethal weapon – may, under certain circumstances, create a risk of serious injury or death that could make the use of the Taser under those circumstances constitutionally unreasonable.") (internal quotations omitted).

C.I. Haser urges us to adopt the District Court's determination that tasing an individual on an elevated surface is "entirely distinguishable" from punching an individual on an elevated surface. *Peroza-Benitez*, 2020 WL 419461, at *5; *see*

14

Appellees' Br. 21-23. C.I. Haser argues that he and Officer White "were holding [Peroza-Benitez] to prevent his fall, in fact making overt efforts to prevent [Peroza-Benitez] from falling. Here, unlike the taser cases, the stunning blows had no effect on [Peroza-Benitez]."[5] Appellees' Br. 21-22. But there need not be a "*precise* factual correspondence between the case at issue and a previous case" for a right to be "clearly established." *Kopec*, 361 F.3d at 778 (emphasis added) (citation and internal quotations omitted). Tasing an individual vulnerable to falling from a precarious height is sufficiently analogous to repeatedly punching an unarmed individual in the head to stun him while he is dangling from a windowsill at a precarious height. Requiring this case to be a factual clone of a previous case would afford C.I. Haser "one liability-free violation," a premise that this Court has repeatedly cautioned against. *See id.* (quoting *People of Three Mile Island*, 747 F.2d at 145); *see also Burns*, 971 F.2d at 1024.

Furthermore, C.I. Haser misconstrues the summary judgment standard. C.I. Haser moved for summary judgment on the grounds of qualified immunity, thus we *must* view the facts in the light most favorable to the non-moving party, *i.e.*, Peroza-Benitez. Under that standard, C.I. Haser "repeatedly" punched Peroza-Benitez in the head, which "stunned and diso-

---

[5] The District Court, as well as C.I. Haser, points to *Franklin v. McGowen*, No. 17-cv-1593, 2019 U.S. Dist. LEXIS 153149 (M.D. Pa. Sept. 6, 2019), which references our decision in *Santini v. Fuentes*, 739 F. App'x 718 (3d Cir. 2018) ("*Santini II*"), for the proposition that "there is no clearly established law suggesting that the conduct of an officer who strikes a non-compliant arrestee who is resisting arrest is unlawful." *Peroza-Benitez*, 2020 WL 419461, at *4 (quoting *Franklin*, 2019 U.S. Dist. LEXIS 153149, at *19); Appellees' Br. 23; *see Santini II*, 739 F. App'x at 721. Yet the conduct at issue in *Santini II* and *Franklin* did not concern a police officer deliberately striking an individual positioned on an elevated surface. As the fact that Peroza-Benitez was hanging from a precarious height is crucial to framing "the specific context of the case," *Saucier*, 533 U.S. at 201, we conclude that neither *Franklin* nor *Santini II* inform our analysis of C.I. Haser's actions under the "clearly established" prong.

15

riented" Peroza-Benitez and caused him to fall from the window. App. 173. Additionally, while C.I. Haser testified that he grabbed ahold of Peroza-Benitez to help him, at a certain point C.I. Haser said to himself, "screw it, you want to fall, you're gonna fall. So we let go of him." App. 187. While the timing of C.I. Haser's decision to let go of Peroza-Benitez relative to punching him is unclear – as is the effect that the punches had on Peroza-Benitez's ability to, for example, climb back through the window or blunt his landing – we must view the facts in the light most favorable to Peroza-Benitez. Under that standard, C.I. Haser's punches caused Peroza-Benitez to fall, and whether C.I. Haser was helping Peroza-Benitez moments before is irrelevant to our analysis at this stage of the proceedings.

In short, there was a "clearly established" right at the time for an injured, visibly unarmed suspect to be free from temporarily paralyzing force while positioned as Peroza-Benitez was. A reasonable jury, on this record, could conclude that C.I. Haser "repeatedly" punched Peroza-Benitez in the head and caused him to fall from a second-story window, in violation of that right. Or a jury could conclude that the facts do not support Peroza-Benitez's account of the incident. But if a jury credited Peroza-Benitez's version, then Peroza-Benitez's "clearly established" right was violated. Thus there is a genuine dispute of material fact regarding C.I. Haser's conduct, which must be resolved by a jury. So we will vacate the District Court's finding that C.I. Haser was entitled to qualified immunity and remand for further proceedings.

**2.**

As to Officer White, the District Court held that he was entitled to qualified immunity because his "use of non-lethal force in the form of a single tase to [Peroza-Benitez], regardless of whether or not [Peroza-Benitez] was armed and whether or not he was unconscious in the moments after falling and being tased, cannot be considered a violation of any clearly established precedent." *Peroza-Benitez*, 2020 WL 419461, at *7. We disagree.

The District Court defined Peroza-Benitez's right as "the Fourth Amendment right to be free from excessive use of force in the form of the use of a taser while not visibly armed

16

(but after the acting officer was informed moments earlier by a fellow officer that [Peroza-Benitez] was armed and in active flight), while laying on the ground after having fallen from a window through which he had attempted to flee and been rendered temporarily unconscious, and after having made no further attempt to flee after hitting the ground." *Id.* at *5. While the District Court "assume[d] [Peroza-Benitez] made no further movements [upon landing] and was knocked temporarily unconscious," it notably concluded in its analysis that Peroza-Benitez's "degree of consciousness after hitting the ground is irrelevant" because Officer White "made a quick decision, deploying his taser *immediately*, essentially *simultaneously* with [Peroza-Benitez] hitting the ground."[6] *Id.* at *6-7. But the consciousness of Peroza-Benitez is not irrelevant to the analysis;

_____

[6] The District Court's definition of Peroza-Benitez's right seemingly did not turn on whether Peroza-Benitez was armed when tased. *Peroza-Benitez*, 2020 WL 419461, at *7. However, the District Court concluded in its analysis that "it was reasonable for [Officer White] to believe that, once [Peroza-Benitez] hit the ground, he was armed and would continue his attempt to escape." *Id.* A court's role at summary judgment is "to determine whether there is a genuine issue for trial," and "not . . . to weigh the evidence and determine the truth of the matter." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The question is whether it was reasonable for Officer White to believe under the circumstances that Peroza-Benitez was armed at the time. And here, that is a question for the jury: According to Peroza-Benitez, he was wearing only boxer shorts and had been hanging onto the windowsill with both hands, which could make visible to a reasonable officer that he was unarmed. *Cf. Russell v. Richardson*, 905 F.3d 239, 252 (3d Cir. 2018) ("[The victim] allegedly exited his room wearing only underwear, making it implausible to a reasonable officer that he was hiding a weapon on his person."); *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (noting that "it should have been apparent that [the plaintiff] was unarmed" given that he "was only dressed in tennis shoes and boxer shorts"). But a jury could also find, for example, that Officer White, standing on the sidewalk, could not clearly see the front waistband of Peroza-Benitez's boxer

17

it is critical. Viewing the facts in the light most favorable to Peroza-Benitez – again, as we *must* do at summary judgment – Peroza-Benitez was tased by Officer White while lying unconscious after having fallen over 10 feet into a below-ground, concrete stairwell. The duration of time that elapsed between Peroza-Benitez hitting the ground and getting tased does not change the fact that, in the light most favorable to Peroza-Benitez, he was tased while visibly unconscious and after multiple seconds had elapsed, App. 264, such that a reasonable jury could find that Officer White should have known that he was tasing an unconscious individual.[7]  Thus, Peroza-Benitez's

---

shorts. Or that Peroza-Benitez was wearing a shirt when hanging onto the windowsill, which obscured his waistband. Either example could make it reasonable for Officer White to believe Peroza-Benitez might still be armed.

[7]  To the extent that Officer White relies on the fact that Peroza-Benitez had been leading officers on a chase, this does not change our analysis. The fact that police may be justified to use force against a fleeing suspect one second, does not necessarily mean that they are justified in using the same degree of force once that individual no longer poses a threat. *Cf. Lamont v. New Jersey*, 637 F.3d 177, 184 (3d Cir. 2011) ("Even where an officer is initially justified in using force, he may not continue to use such force after it has become evident that the threat justifying the force has vanished.") (citation omitted); *Anthony v. Seltzer*, 696 F. App'x 79, 82-83 (3d Cir. 2017) (noting the existence of pre-2013 precedent in support of the "long-established Fourth Amendment law, [that] force may not legitimately be used against an individual who is compliant and poses no ongoing threat to himself or others, or who is not resisting arrest, even if he was initially non-compliant" and holding that "the continued application of force to an unthreatening and subdued individual suffering a seizure constituted an unreasonable use of force under the Fourth Amendment"). Additionally, a reasonable jury could conclude that the police pursuit of Peroza-Benitez had come to an end, and Peroza-Benitez no longer posed a threat to officers. *See, e.g.*, App. 97-99, 108 (Officer White testified that he holstered his firearm while Peroza-Benitez hung from the window as he believed that "the situation was becoming more contained" and Peroza-Benitez was "figuratively boxed in"). Or, of course, a reasonable jury

18

right at issue boils down to the following: The Fourth Amendment right to be free from excessive force in the form of being tased while visibly unconscious.

There is a "robust consensus of cases" that support the proposition that tasing a visibly unconscious person – who just fell over ten feet onto concrete – is a violation of that person's Fourth Amendment rights. *See, e.g.*, *Wimett v. Sothern*, No. 12-cv-01406, 2014 WL 4059768, at \*14 (D. Or. Aug. 14, 2014) ("[The plaintiff's] right not to suffer multiple TASER cycles while unconscious was clearly established. Any reasonable officer would understand that using a TASER in dart mode to cycle current through an unconscious person multiple times is excessive. . . . [A]n unconscious suspect poses no danger to the arresting officer or others.") (citing *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010) and *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011)); *Smith v. City & Cnty. of Denver*, No. 07-cv-00154, 2008 WL 724629, at \*7 (D. Colo. Mar. 18, 2008) ("[U]nder the Tenth Circuit's sliding scale . . . it was clearly established that an officer may not tase an unconscious suspect. Although Plaintiff has not supplied a citation to a factually similar case, I think that it is particularly clear from *Graham* [*v. Connor*, 490 U.S. 386 (1989)] itself that it is a Fourth Amendment violation to tase an unconscious suspect.") (internal quotations and citation omitted); *cf. Simmons v. Hinton*, No. 13-cv-2566, 2015 WL 1041583, at \*4, \*6 (D. Colo. Mar. 5, 2015) (denying summary judgment on the grounds of qualified immunity, in part because "a reasonable officer would not have reason to believe that a person who had already been tased once and was lying motionless on the ground posed an immediate threat to the officer's safety" and "a reasonable law enforcement officer would have known that these actions [*i.e.*, continued tasing, as well as punching and kneeing], in the face of nonresistance, constituted excessive force") (emphasis omitted); *Gray v. Torres*, No. 08-cv-1380, 2009 WL 2169044, at \*4 (D. Md. July 17, 2009) (denying summary judgment on the grounds of qualified immunity for a police officer who deployed his taser a second time after his first

could reach the opposite conclusion and find that the chase was still in progress given officer testimony that Peroza-Benitez voluntarily moved upon landing. *See, e.g.*, App 262, 68. But again, this is a question that the jury must resolve.

19

tase knocked an individual "unresponsive and motionless," and noting that "[i]f [the victim] was attempting to comply with [the police officer's] orders before the first tase and was motionless and unresponsive with his hands by his side after the first tase, [the police officer] would not be entitled to qualified immunity").[8]

We acknowledge that "[t]here must be 'allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'" *El v. City of Pittsburgh*, 975 F.3d 327, 342 (3d Cir. 2020) (quoting *Graham*, 490 U.S. at 396-97). But that premise, while paramount to explaining the challenges that police officers face on the job, does not entitle a police officer to circumvent the law, or bypass the qualified immunity inquiry. That being said, we hold that the right not to be tased while visibly unconscious was "clearly established" at the time and that a reasonable jury could find that Officer White violated this right. To be sure, a jury could find that the facts do not support Peroza-Benitez's account – for example, by finding that Peroza-Benitez was not unconscious and was still trying to flee, that Officer White reasonably believed Peroza-Benitez was armed, or that there was not enough time for Officer White to recognize that Peroza-Benitez was unconscious. But if a jury credited Peroza-Benitez's version of events, then Peroza-Benitez's "clearly established" right was violated. Thus, here too we have a genuine dispute of material fact for the jury to

---

[8] Peroza-Benitez also cites *Tennyson v. Hatton*, in which the district court – in denying defendant's motion to dismiss on qualified immunity grounds – concluded that "[a] reasonable law enforcement officer would know that using a taser on an unresisting, unconscious person was unreasonable force and that an officer observing such a use of excessive force has a duty to prevent the harm." No. 16-cv-1206, 2018 WL 4630213, at *5 (E.D. Tex. July 9, 2018), *report and recommendation adopted by district judge* 2018 WL 3993395 (E.D. Tex. Aug. 19, 2018); Appellant's Br. 32. While *Tennyson* was decided after the events before us on appeal, and thus could not have put Officer White on notice, we note that the right at issue in *Tennyson* concerned an incident that occurred less than 20 days after the incident here.

resolve, and we will vacate the District Court's finding that Officer White was entitled to qualified immunity and remand for further proceedings.

## IV.

Pursuant to 28 U.S.C. § 1367(c), the District Court declined to exercise supplemental jurisdiction over Peroza-Benitez's remaining state law battery claims. We direct the District Court to reconsider on remand the question of supplemental jurisdiction in light of our decision to reinstate Peroza-Benitez's § 1983 claims. *See Santini I*, 795 F.3d at 421.

## V.

For these reasons, we will vacate the order of the District Court granting summary judgment in favor of C.I. Haser and Officer White on the grounds of qualified immunity and remand for further proceedings consistent with this opinion.[9]

---

[9] We do not find it necessary to reach the first prong of the qualified immunity test for either C.I. Haser or Officer White and leave it to the District Court to address on remand.