In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 24-1099

DONALD NICODEMUS,

*Plaintiff-Appellant,*

*v.*

CITY OF SOUTH BEND, INDIANA,

*Defendant-Appellee*

*and*

STATE OF INDIANA,

*Intervenor-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 23-cv-00744 — **Damon R. Leichty**, *Judge.*

---

ARGUED SEPTEMBER 27, 2024 — DECIDED MAY 15, 2025

---

Before BRENNAN, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges.*

PRYOR, *Circuit Judge.* Indiana has a "buffer law" making it a crime for a person to knowingly or intentionally approach an officer who is "lawfully engaged in the execution of the

law enforcement officer's duties after the law enforcement officer has ordered the person to stop approaching." Indiana Code (I.C.) § 35-44.1-2-14. Seeking declaratory and injunctive relief, Donald Nicodemus, a citizen-journalist, challenged the law as facially unconstitutional. He argues that it violates his First Amendment right to record the police in public spaces. After consolidating Nicodemus's motion for a preliminary injunction with a trial on the merits, the district court found Indiana's buffer law to be constitutional because it only had an "incidental effect" on the public's First Amendment right to record and scrutinize police activity. The district court denied Nicodemus's injunction request and entered final judgment for the defendants. For the reasons below, we affirm.

## I. BACKGROUND

### A. Factual Background

There was a full bench trial in this case, so we defer to the district court's findings of fact in the absence of clear error. *Green v. UPS Health & Welfare Package for Retired Emps.*, 595 F.3d 734, 736 (7th Cir. 2010). The parties do not dispute the district court's factual findings, so we begin there. *Id.*

Nicodemus is a citizen journalist from South Bend whose YouTube channel, "Freedom 2 Film," has over 23,000 subscribers. Nicodemus records police activity in and around South Bend and posts his recordings to his channel. He also "livestreams" police activity, meaning he broadcasts police activity live for his YouTube subscribers to view in real time. He does this to bring awareness to the public of police conduct, assist in ending inappropriate or problematic law enforcement behavior, and educate the public of "newsworthy activities."

After midnight on July 20, 2023, shots were fired in downtown South Bend, Indiana, at the intersection of North Brookfield Street and Lincoln Way West. Nicodemus hurried to the scene. When he arrived, police were at the southwest corner of the intersection marking bullet casings. Six squad cars were present, with some blocking parts of the road. Nicodemus positioned himself on the sidewalk at the northeast corner of the intersection, joining a group of onlookers, and began livestreaming.

Soon after, Officer Nathan Stepp walked up to the group and told them to move back. Invoking the buffer law, he counted off 25 feet from the west side of Brookfield Street, where a squad car was parked, and told Nicodemus and the others to move behind the imaginary 25-foot buffer line. Nicodemus was already across the street from the squad car, so he only had to move back a few feet. He continued recording while conversing with and criticizing the officers.

Then came a disturbance on the north side of Lincoln Way, past the intersection. Nicodemus could not see what was happening from his vantage point but chose to stay put instead of seeking an alternative angle. He and another videographer yelled at the police, asserting their right to record. In response, Officer Jeffrey Veal approached the group. Explaining that this area of the intersection was a crime scene and invoking the buffer law, Officer Veal told the group to move back another 25 feet. Nicodemus protested that he had already been moved but complied after being threatened with arrest.

Nicodemus claims that he sometimes needs to get closer than 25 feet to effectively record or livestream police activity, but that he does not disrupt or interfere with police work when he does. If he is more than 25 feet away, it can be

difficult for him to see and hear what is happening and to cap-
ture police activity with his recording device.

### B. Procedural History

On August 8, 2023, Nicodemus sued the City of South
Bend, Indiana, alleging that Indiana's buffer law violated the
First Amendment both on its face and as applied to him. He
later dropped his as-applied challenge.[1] Nicodemus also
moved for a preliminary injunction enjoining the City from
enforcing the buffer law.

In his preliminary injunction motion, Nicodemus main-
tained that the buffer law is facially unconstitutional because
it gives unbridled discretion to law enforcement officers to
create a 25-foot buffer zone with no guidance. Without safe-
guards, Nicodemus argued the police are now allowed to in-
terfere with a citizen's observation of police activity in public
spaces—a right we recognized in *ACLU of Illinois v. Alvarez*,
679 F.3d 583 (7th Cir. 2012).[2] Nicodemus explained that be-
cause the buffer law lacked "objective, workable standards"
to guide the police officer's determination of when to invoke
the law, it failed to satisfy the First Amendment. In addition,
Nicodemus maintained that the law is not narrowly tailored
to serve a significant government interest and does not leave

---

[1] (Dkt. 20 at 10) (arguing that the "statute is facially unconstitutional");
(App. Dkt. 13 at 7) (characterizing argument below as a facial challenge);
(Dkt. 42, Oral Arg. Trans., at 22:10–11) (Nicodemus's attorney explaining
to the court that "we're dealing with a facial challenge"); (*Id*. at 17:15–18)
(describing buffer law as "facially unconstitutional").

[2] We refer to this First Amendment right for convenience as the "right
to record."

open ample alternative channels of communication, in violation of First Amendment precedent.

The State of Indiana intervened to defend the law on August 21, 2023. On October 6, 2023, being advised that Nicodemus did not oppose, the district court consolidated the hearing on the preliminary injunction motion with a trial on the merits of the complaint pursuant to Federal Rule of Civil Procedure 65(a)(2). The court held a bench trial a week later, on October 13, 2023.

After the trial, the district court determined that Indiana's buffer law was not facially unconstitutional. Specifically, the court held the law did not violate the First Amendment because it had many permissible public safety justifications and posed only an incidental burden on a person's right to record. The district court entered judgment for the defendants. Nicodemus appeals.

## II. Discussion

Nicodemus maintains that Indiana's buffer law violates the First Amendment because it gives unbridled discretion to law enforcement officers to determine when people may engage in protected activities on public sidewalks and in the street. In the alternative, he also argues that the buffer law violates the constitutional requirement that a regulation of expressive conduct in a public forum be "narrowly tailored" and "leave open ample alternative channels of communication." *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

### A. Standard of Review

Ordinarily we would review the district court's grant or denial of a permanent injunction for abuse of discretion. *3M v. Pribyl*, 259 F.3d 587, 597 (7th Cir. 2001). However, because this appeal presents only a legal question—the facial constitutionality of Indiana's buffer law—we review this determination de novo. *Doe v. Prosecutor, Marion Cnty., Ind.*, 705 F.3d 694, 697 (7th Cir. 2013). A legal error may establish an abuse of discretion. *EEOC v. Wal-Mart Stores, Inc.*, 38 F.4th 651, 661 (7th Cir. 2022).

### B. Indiana's Buffer Law

Before we can analyze the constitutionality of the buffer law, we first need to understand what it does and does not provide. The district court found the law prohibits a person from knowingly or intentionally approaching an officer within 25 feet after being ordered not to approach. We tend to agree.

The parties, however, argue as though the buffer law, once invoked, allows an officer to move anyone who happens to be within a 25-foot radius of the officer back to a point outside that radius. We reject this apparently shared premise.[3]

---

[3] Although we generally follow the arguments presented by the parties, this rule is "not ironclad." *Bernacchi v. First Chicago Ins. Co.*, 52 F.4th 324, 328 (7th Cir. 2022) (citation omitted). "A court … 'retains the independent power to identify and apply the proper construction of governing law.'" *Id.* (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)). We may consider a legal issue that is "antecedent to" and "ultimately dispositive of" the matter before us, "even an issue the parties fail to identify and brief." *Id.* (quoting *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993)) (additional citation omitted). Such

When interpreting a statute, Indiana courts begin with the text. If the text is "clear and unambiguous," courts "simply apply its plain and ordinary meaning, heeding both what it 'does say' and what it 'does not say.'" *Mi.D. v. State*, 57 N.E.3d 809, 812 (Ind. 2016) (quoting *State v. Dugan*, 793 N.E.2d 1034, 1036 (Ind. 2003)).

Indiana's "Unlawful Encroachment on an Investigation" law, referenced here as the buffer law, took effect on July 1, 2023. It was invoked against Nicodemus less than three weeks later. It provides, in its entirety:

> A person who knowingly or intentionally *approaches* within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop *approaching* commits unlawful encroachment on an investigation, a Class C misdemeanor.

I.C. § 35-44.1-2-14 (emphasis added).

A form of the verb "approach" triggers the buffer law twice over.[4] First, an officer must invoke the law by ordering someone to "stop approaching." Someone who is not "approaching" in the first place cannot logically be ordered to "stop approaching." Second, once told to stop approaching,

---

consideration is appropriate here because we cannot assess the constitutionality of the buffer law without first clarifying what it means.

[4] According to the Oxford English Dictionary, "approach" means "[t]o come nearer to" or to "draw near ... in space." *Approach*, Oxford English Dictionary, https://www.oed.com/dictionary/approach_v?tab=meaning_and_use#120008 (last retrieved April 20, 2025).

only someone who nevertheless "knowingly or intentionally approaches" within 25 feet of the officer violates the buffer law and risks being convicted of a Class C misdemeanor in Indiana. That is what the buffer law "does say."

What the law "does not say" is that an officer may use the buffer law to order a person to move *away* to a point that is 25 feet or more from the officer. As the district court noted, the buffer law criminalizes a person's knowing encroachment into an officer's "zone of integrity" after the officer has advised the person to stop approaching. In other words, the buffer law is not a force field.

Nor does the law say anything about video recording. If ordered to stop approaching, one does not violate the buffer law by stopping one's advance, staying put, and, if recording, continuing to record. *See Hill v. Colorado*, 530 U.S. 703, 720, 726–27 (2000) (explaining that abortion clinic buffer law prohibiting "knowingly approach[ing]" within eight feet of someone "allows the speaker to remain in one place, and other individuals can pass within eight feet of the [speaker] without causing the [speaker] to violate the statute").[5]

---

[5] As the foregoing discussion demonstrates, we need not certify the question of the buffer law's construction to the Indiana Supreme Court under Seventh Circuit Rule 52(a). Although some factors weighing in favor of certification are present here, the most important consideration is whether we find ourselves "genuinely uncertain" about the answer to a question of state law. *Jadair Int'l, Inc. v. Am. Nat'l Prop. & Cas. Co.*, 77 F.4th 546, 556–57 (7th Cir. 2023) (quoting *Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1166 (7th Cir. 2021)). Guided as we are by the plain meaning of "approach" and the United States Supreme Court's construction of the word in an analogous buffer law case, we will not "burden our esteemed colleagues in the [Indiana Supreme Court]." *Id*. at 556.

With this understanding in mind, we proceed by first examining the relevant First Amendment legal principles.[6]

**C. First Amendment**

### 1. *Applicability of the First Amendment*

Because Indiana's buffer law says nothing about speech on its face, we begin by explaining why this is a First Amendment case in the first instance.

The First Amendment protects our freedom of speech, and laws that impermissibly encroach upon that freedom are unconstitutional.[7] *Agency for Int'l Dev. v. All. for Open Soc'y Int'l,*

---

[6] In *Schirmer v. Nagode,* we held that a lawsuit based on "a clear misuse of a law does not provide a basis for a federal court to explore that law's facial constitutionality." *Schirmer v. Nagode*, 621 F.3d 581, 588 (7th Cir. 2010). The operative word is "clear." Unlike the statute in *Schirmer*, Indiana's buffer law was just three weeks old when it was invoked against Nicodemus, and no court had yet interpreted it. *See id.* Officers Stepp and Veal may have misused the buffer law, but any misuse on their part was not "clear." *See Brown v. Kemp*, 86 F.4th 745, 756–66 (7th Cir. 2023) (distinguishing *Schirmer* by explaining that *Schirmer* applied only in cases where "there was no plausible argument that plaintiffs had violated the ordinance in question"). Given the novelty of the statute and its enforcement, we conclude that the "clear misuse" rule from *Schirmer* does not strip Nicodemus of standing to seek injunctive relief and facially challenge the buffer law. Nicodemus intends to keep filming the police and has a reasonable fear that the buffer law will be enforced against him in the future to prevent him from approaching police officers executing their duties in public, so his challenge may be characterized as seeking either pre-enforcement review or prospective relief. *See Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012). He has standing under either theory, and *Schirmer* does not alter this conclusion.

[7] The First Amendment applies to the states by the Due Process Clause of the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

*Inc.*, 570 U.S. 205, 213 (2013). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). First Amendment protection also extends beyond speech to "conduct that is inherently expressive." *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 65–66 (2006).

Nowhere are the First Amendment's protections stronger than in public streets, sidewalks, parks, and similar locations, as these places "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). One's ability to access these sacrosanct places—be it to lead a rally or to "protest by silent and reproachful presence"—is a First Amendment concern in and of itself. *Brown v. Louisiana*, 383 U.S. 131, 142 (1966).

In *McCullen v. Coakley*, the Supreme Court applied First Amendment scrutiny to a law establishing 35-foot buffer zones outside the entrances and driveways of Massachusetts abortion clinics. 573 U.S. 464, 476–77 (2014). Even though the law said "nothing about speech on its face," there was "no doubt" it was "subject to First Amendment scrutiny" because it "restrict[ed] access to traditional public fora." *Id.* at 476.

So too here. Although Indiana's buffer law says "nothing about speech on its face," it "restricts" those who want to engage in protected First Amendment activity from "access[ing]" traditional public forums. *Id.* The buffer law is therefore subject to First Amendment scrutiny. *Id.*

Our precedent further supports this conclusion. We held in *ACLU of Illinois v. Alvarez* that there is a First Amendment right to record the police in the execution of their duties in public spaces. 679 F.3d at 600–01.[8] Our colleagues in the First, Third, Fifth, Ninth, and Eleventh Circuits also recognize this right to record. *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011); *Fields v. City of Philadelphia*, 862 F.3d 353, 359–60 (3d Cir. 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000).

The right to record flows from multiple First Amendment interests. For starters, the act of recording is itself an expressive activity, and "is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *Alvarez*, 679 F.3d at 595–96; *see also id.* at 602–03. The right to record further flows from "our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," especially when it pertains to the actions of government officials. *Id.* at 597 (quoting *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011)); *accord Turner*, 848 F.3d at 689 (observing that "[f]ilming the police contributes to the public's ability to hold the police accountable … and make informed decisions about police policy"); *Fields*, 862 F.3d at 359 (explaining that the right to record connects to "the right for the eye to see or the

---

[8] The right to record is not unlimited. *Alvarez*, 679 F.3d at 607. The First Amendment does not "immunize[] behavior that obstructs or interferes with effective law enforcement or the protection of public safety." *Id.* Nor does it prohibit the police from ordering onlookers to disperse for public safety reasons unrelated to recording. *Id.*

ear to hear" in public places); *Brown v. Kemp*, 86 F.4th 745, 771–
78 (7th Cir. 2023) (applying First Amendment scrutiny to Wis-
consin law prohibiting "maintaining a visual or physical
proximity" to people hunting on public land).

Given the interests underlying the right to record, it is in-
tuitive that this specific right is affected by Indiana's buffer
law. *See McCullen*, 573 U.S. at 488–90; *Hill*, 530 U.S. at 725–28
(2000); *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357,
377–380 (1997). Because the scope of Indiana's buffer law
reaches expressive activity in traditional public forums, First
Amendment interests are in play.

### 2. Analytical Framework

We now turn to the applicable legal framework. The gov-
ernment has a "very limited" ability to regulate speech in tra-
ditional public forums, but the Supreme Court has given
somewhat "wider leeway" when the regulation at issue fo-
cuses on "features of speech unrelated to its content" *McCul-
len*, 573 U.S. at 477. In this instance, the government is permit-
ted to "enforce regulations of the time, place, and manner of
expression which are content-neutral, are narrowly tailored
to serve a significant government interest, and leave open am-
ple alternative channels of communication." *Perry Educ.
Ass'n*, 460 U.S. at 45; *see also Ward*, 491 U.S. at 791 (citation
omitted). The question, therefore, is whether Indiana's buffer
law satisfies this test.

### 3. Application to Indiana's Buffer Law
#### a. Content-Based or Content-Neutral

As the discussion above foreshadows, we must determine
whether Indiana's buffer law is content-based or content-neu-
tral. Content-based laws "suppress, disadvantage, or impose

differential burdens upon speech because of its content." *Turner Broad. Sys., Inc.,* 512 U.S. at 642. Such laws must survive strict scrutiny, meaning they are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *TikTok, Inc. v. Garland*, 604 U.S. --, 145 S. Ct. 57, 67 (2025) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

On the other hand, content-neutral laws generally "confer benefits or impose burdens on speech without reference to the ideas or views expressed." *Turner Broad. Sys., Inc.*, 512 U.S. at 643. "The principal inquiry in determining content-neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791–92 (citation omitted). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.*

On its face, Indiana's buffer law regulates conduct rather than the content of speech itself, and should qualify as content-neutral. *Id.* at 798. Nicodemus argues, however, that the buffer law is actually content-based because it gives "unbridled discretion" to the police officer to decide when to enforce the law. Without objective, workable standards to guide the officer's determination of when to order a person to stop approaching, Nicodemus maintains this law is an unconstitutional restriction on speech in the public forum in violation of the First Amendment. To support his argument, Nicodemus analogizes to two Supreme Court cases treating facially content-neutral laws as content-based: *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), and *City of Houston v. Hill*, 482

U.S. 451 (1987). He also invokes a special line of cases treating certain government permitting and licensing policies as content-based for giving "unbridled discretion" to the relevant decisionmakers, which he contends the buffer law does here. We consider each argument in turn.

### i. *Analogy to* Holder

In *Holder*, the Supreme Court examined a First Amendment challenge to 18 U.S.C. § 2339B, which bans the provision of "material support or resources" to designated foreign terrorist organizations. 561 U.S. at 7. The statute defines "material support" as any service, training, personnel, expert advice or assistance. *Id.* at 8–9 (citing 18 U.S.C. § 2339A(b)(1)). The challengers wanted to provide assistance to designated foreign terrorist organizations. Even though the statute purportedly regulated behavior, the Supreme Court held that it was functionally content-based. The reason was simple: the challengers wanted to interact with foreign terrorist organizations, "and whether they [could] do so under § 2239B depend[ed] on what they [said]." *Id.* at 27. Thus, the Court reasoned that "as applied to plaintiffs[,] the conduct triggering coverage under the [material support] statute consists of communicating a message." *Id.* at 28. Providing a foreign terrorist organization with expert training or specialized knowledge would inherently communicate support for the organization. *Id.* Finding the statute content-based, the Court applied "a more demanding standard" than intermediate strict scrutiny. *Id.*

Nicodemus argues that his case "is no different than the situation presented in *Holder*," and that we should apply that heightened standard in determining the constitutionality of Indiana's buffer law. We decline the invitation. The statute in

*Holder* was considered a direct regulation of speech because, as applied, it targeted First Amendment protected conduct done in coordination with a designated foreign terrorist organization, which the Supreme Court determined could constitutionally be punished. *Id.* at 19–20, 26–28, 36–39. By contrast, Indiana's buffer law cannot be considered a direct regulation of speech. One's movement toward an officer within the buffer zone after being told by the officer to stop approaching triggers the buffer law, not any speech or message that one may seek to convey. The reasoning in *Holder* is therefore not applicable to Nicodemus's facial challenge.

### ii.  *Analogy to* City of Houston

Nicodemus next relies on *City of Houston* in arguing Indiana's buffer law is content-based, but that case is similarly inapposite. *City of Houston v. Hill*, 482 U.S. 451 (1987). *City of Houston* involved a facial challenge to a city ordinance which provided, in relevant part:

> It shall be unlawful for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty, or any person summoned to aid in making an arrest.

*Id.* at 455.

At first blush, this looks like a content-neutral law regulating conduct. But the words "assault" and "strike" were preempted by a separate state law. *Id.* at 460. Untethered to the words of violence, the Supreme Court found the words "oppose," "molest," "abuse," or "interrupt" were too generic, giving police too much discretion to "arrest individuals for words or conduct that annoy or offend them." *Id.* at 465. In

other words, the ordinance effectively allowed the police to discriminate against speech based on its content. *Id*.

We are not persuaded that *City of Houston* applies here. Unlike the remnants of the ordinance in *City of Houston*, the language in the Indiana buffer law covers only conduct—approaching within 25 feet of an officer after being told not to—instead of speech.

### iii.  Analogy to permitting and licensing cases

Finally, Nicodemus invokes a special line of cases dealing with permitting and licensing statutes in public forums. Courts have concluded in such cases that the policies are not content-neutral if they "invest unbridled discretion in the person who decides whether a permit will issue." *Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014) (internal quotation omitted). This is because "a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).

*City of Lakewood* illustrates the logic. In that case, the Supreme Court struck down a local ordinance requiring newspaper publishers to apply directly to the mayor for permission to place newspaper stands on public sidewalks, effectively giving the mayor control over whether—and which—publishers could exercise their First Amendment rights in the city. *Id.* at 753–56, 769–72.

While Nicodemus acknowledges that Indiana's buffer law is not a permitting or licensing statute, he nevertheless urges us to extend the logic underlying these cases to hold that the buffer law is not content-neutral. The buffer law does not list

the circumstances under which an officer may invoke it (outside of the requirement that the officer be lawfully engaged in his duties), so in Nicodemus's view it is subject to the same abuse as a licensing statute that gives "unbridled discretion" to a single decisionmaker.[9]

We explore Nicodemus's critique later on, but we decline to import the logic of the permitting and licensing cases from their specialized context to deem the buffer law content-based. Just one year after *City of Lakewood*, the Supreme Court decided *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). In *Ward,* organizers of an event in New York City's Central Park challenged the City's requirement to use City-provided audio equipment and sound technicians, arguing the policy gave City officials "unbridled discretion" to choose "the volume and quality of sound based on the message being conveyed by the performers." 491 U.S. at 793. However, because the challengers had not contended that the City's audio equipment policy gave officials the power to "deny the right to speak altogether," the Court found it questionable whether their claim fell within "the narrow class of permissible facial challenges to allegedly unconstrained grants of regulatory

---

[9] We note that Nicodemus's critique has some conceptual overlap with a void-for-vagueness argument under the Fourteenth Amendment's Due Process Clause. A criminal statute is unconstitutionally vague, and thus does not satisfy due process, if it defines a criminal offense in a manner that encourages "arbitrary and discriminatory enforcement." *Skilling v. United States*, 561 U.S. 358, 402–03 (2010) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). But Nicodemus explicitly disavowed reliance on a vagueness theory before the district court, and does not advance such an argument on appeal, either. (Dkt. 42 at 19). We therefore do not consider, in this case, whether the buffer law is unconstitutionally vague.

authority." *Id.* at 794. The Court upheld the City's policy by applying intermediate scrutiny. *Id.* at 788–803.

Like the audio equipment policy in *Ward*, Indiana's buffer law does not allow police to "deny the right to [record] altogether." *See id.* at 794. To be sure, the buffer law may make recording more inconvenient by effectively requiring onlookers to record from a maximum of 25 feet away. But that is a far cry from denying the right to record outright. The law thus operates in a more nuanced way than the binary nature of licensing or permitting schemes. Although the denial of a permit could limit altogether one's ability to engage in protected activity, the invocation of Indiana's buffer law could not. *See City of Lakewood*, 486 U.S. at 757. Nothing in the buffer law requires videographers to seek permission from the police or any other government official before hitting "record."[10] Therefore, we find Indiana's buffer law is a content-neutral

---

[10] Nicodemus cites several other cases in which the Supreme Court—although not invoking the "unbridled discretion" doctrine—criticized policies which ceded too much arbitrary decision-making power to government officials. But those cases either involved overbreadth or vagueness challenges, which Nicodemus has disavowed, or, like the permitting and licensing cases, concerned the potential denial of free speech rights altogether. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 21–23 (2018) (striking down Minnesota's ban on wearing "political" apparel in polling places in part because it gave election judges too much discretion in deciding what counted as "political"); *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 570–71, 576 (1987) (striking down resolution declaring that a city's airport terminal was "not open for First Amendment activities"); *City of Houston*, 482 U.S. at 472 (striking down ordinance allowing police to arbitrarily arrest, and thus stop from speaking, anyone who "annoy[ed]" them).

restriction on the "time, place, or manner of protected speech." *See id.* at 798.

#### iv. *Indiana's buffer law is content-neutral*

A government's regulation of expressive activity is content-neutral if it is "justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791. "The government's purpose is the controlling consideration." *Id.* Therefore, even if Indiana's buffer law has an "incidental effect" on First Amendment expressive activities, the law is still considered content-neutral if its purpose is unrelated to the content of speech. *Id.*

The State of Indiana justifies the buffer law by citing an interest in officer and bystander safety, the need for conversational privacy between witnesses and investigating officers, and the desire to improve law enforcement efficiency by reducing distractions. None of these justifications relate to the content of any impacted speech, including potential video recordings. In addition, the sponsor of the buffer law, when introducing the bill to Indiana's Senate Committee on Corrections and Criminal Law, explained that the buffer law seeks to establish a "reactionary gap" of time and distance between an officer and members of the public who would seek to harm that officer while he is lawfully engaged in his investigative duties. *Hearing on H.B. 1186 Before the Senate Committee on Corrections and Criminal Law*, Ind. Gen. Ass'y 2023 Sess. (March 7, 2023). Although other Indiana statutes, for example, allowed officers to establish set perimeters around crime scenes, the sponsor explained that the bill would give officers a de-escalation tool when conducting active investigations or effectuating an arrest warrant.

For his part, Nicodemus speculates that the true motive behind the law is animosity toward the right to record, but speculation is not enough. "It is a familiar principle of constitutional law that [courts] will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968); *McCray v. United States*, 195 U.S. 27, 56 (1904). Because the statute does not relate to the content of any speech, and the government's purpose for the law is controlling, we conclude Indiana's buffer law satisfies the requirement that time, place, or manner regulations be content-neutral.

### b. Narrowly Tailored

Next, we move to the narrow tailoring requirement. A content-neutral statute is narrowly tailored if does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Turner Broad. Sys., Inc.*, 512 U.S. at 662 (quoting *Ward*, 491 U.S. at 799); *TikTok*, 145 S. Ct. at 70. There must be "a reasonably close fit between the law's means and its ends," *Alvarez*, 679 F.3d at 605, though perfect calibration is not required. *Ward*, 491 U.S. at 797 (holding court of appeals erred in requiring content-neutral statute to be the least restrictive means of achieving government's goals); *Hill*, 530 U.S. at 730–31. The inquiry boils down to whether the "time, place, and manner" regulation at issue is "reasonable." *Ward*, 491 U.S. at 791; *Hill*, 530 U.S. at 730–31.

The district court found the buffer law serves the government's interest in maintaining police and citizen safety, including the safety of onlookers, and in protecting the integrity of police work in a wide variety of investigative contexts. Nicodemus acknowledges that public safety and preventing interference with police work are legitimate government

interests. But he argues that the existence of statutes that arguably address those interests with more specificity shows why the buffer law is not narrowly tailored.

He points to I.C. § 35-44.1-3-1, under which one who "knowingly or intentionally forcibly resists, obstructs, or interferes" with law enforcement activities commits a Class A misdemeanor. He also raises I.C. § 35-44.1-4-5, which makes it a Class A misdemeanor to knowingly or intentionally refuse to leave an emergency incident area when requested to do so by a law enforcement officer. Emergency incidents include crimes scenes, police investigations, and locations where an individual is being arrested. I.C. § 35-44.1-4-1.5. An "emergency incident area" means an area defined by public safety officers either orally or with certain physical markers; or that is 25 feet "in all directions from the perimeter of the emergency incident." I.C. § 35-44.1-4-2.

It is true that there may be some overlap between the buffer law and statutes already on the books. But, as discussed earlier, the buffer law aims to fill gaps left by the existing statutory scheme in active investigatory situations, and is intended to protect onlookers by giving officers a de-escalation tool. Given that the buffer law is not a force field—it allows those already present and recording to stay put and keep recording—we are not persuaded that it burdens substantially more speech than necessary to achieve its goals. *See Ward*, 491 U.S. at 799; *see Hill*, 530 U.S. at 726–27.

Nicodemus also argues that the buffer law is not narrowly tailored because it does not specify the situations in which it may be invoked. He claims the law "allows persons to be moved away from police when there are no reasons to do so." But, as we have already explained, the buffer law is not as

onerous as Nicodemus claims: it allows officers to order people to stop approaching, but not to move away. One can comply with the buffer law by remaining in place.

We also observe that an officer's enforcement of Indiana's buffer law is constrained by clearly established law in our circuit that police may not order people to disperse just because they are exercising their right to record. *Alvarez*, 679 F.3d at 607. A challenge to the buffer law based on such improper application would be better suited, as the district court noted, to an as-applied challenge like in *Alvarez*.[11] *See id.* at 608 (enjoining enforcement of Illinois eavesdropping statute as applied to those seeking to record the police in public). Because the buffer law is not substantially broader than necessary to achieve Indiana's interest, we conclude it is narrowly tailored.

### c. Alternative Channels of Communication

Finally, we look at the availability of alternative channels for communication. As Nicodemus observes, such alternatives need not be "the speaker's first choice," *Weinberg v. City of Chicago*, 310 F.3d 1029, 1041 (7th Cir. 2002), but they must be "realistic" and "more than theoretically available," *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000).

---

[11] The State also argues that the buffer law is constrained by the South Bend Police Department's Policy Manual, which explicitly recognizes and expresses respect for the right to record. *See Ward*, 491 U.S. at 795–96 ("Administrative interpretation and implementation of a regulation are … highly relevant" to analysis of a facial challenge). Maybe so, but Nicodemus has challenged the law on its face, not as it applies in South Bend. The State offers no evidence that South Bend's limiting construction is shared statewide. This is different from the audio equipment policy in *Ward*, which applied only in New York City and was therefore wholly subject to New York City's construction of the policy. *See id*. at 794–96.

Nicodemus argues there are no adequate alternatives available to him because the buffer law "allow[s] police to arbitrarily require persons to move an initial 25-foot distance, and then perhaps more increments of 25 feet," which could effectively eliminate his ability to record police activity. He analogizes to *Schenck*, in which the Supreme Court struck down a 15-foot "floating" buffer zone around people entering or leaving abortion clinics. 519 U.S. at 377–79. The Court observed that 15 feet is beyond "normal conversational distance," and that the floating nature of the buffer zones would require demonstrators seeking to converse with clinic patients to be in constant motion and constantly on alert for patients who may happen to pass within 15 feet. *Id.* The risk of inadvertent non-compliance was thus very high. *Id.* at 379.

We reject Nicodemus's reliance on *Schenck*. The "floating" buffer zones in *Schenck* forced speakers to either constantly be on the move or constantly be vigilant of clinic patrons on the move. By contrast, the Indiana buffer law, at most, directs someone to stop approaching. Therefore, a videographer within 25 feet of an officer may remain in place and keep recording under the buffer law, or even move to a different location, so long as they are not "approaching" the officer after the officer has ordered them to stop. *See Hill*, 530 U.S. at 726–27.

Nicodemus argues that 25 feet is beyond normal "conversational distance," which *Schenck* pegged at less than 15 feet, 519 U.S. at 377–79, but "conversational distance" is less relevant to a videographer seeking to record police activity rather than to engage in conversation. Moreover, the Supreme Court made its observation about conversational distance well before it recognized the ubiquity and power of modern

smartphones with built-in cameras and microphones. *See Riley v. California*, 573 U.S. 373, 393–97 (2014). We agree that distance may impact the right to record, but we decline to decide this case based on an observation about "conversational distance" in a different context.

To the extent the buffer law restricts the right to record, it is a reasonable "time, place, or manner" restriction within the bounds of the First Amendment on its face.[12] *Ward*, 491 U.S. at 791. Although Nicodemus argues that *his* ability to record was impacted by the actions of Officers Stepp and Veal, he has not asked us to decide whether the buffer law is unconstitutional as applied to him or any other citizen journalist.

## III. Conclusion

For the foregoing reasons, we AFFIRM.

---

[12] Because we affirm the district court, we do not reach the State's alternative argument that the City of South Bend is an improper defendant under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).